UNITED STATES, Appellee

v.

Bruce D. TURNER, Technical Sergeant
U.S. Air Force, Appellant.

No. 68,386.
CMR No. S28163.

U.S. Court of Military Appeals.

Argued Oct. 5, 1993.

Decided June 3, 1994.

For Appellant: *Captain Robert I. Smith* (argued); *Colonel Terry J. Woodhouse* (on brief); *Colonel Jay L. Cohen, Lieutenant Colonel Frank J. Spinner, Major Mary C. Yastishock.*

For Appellee: *Captain Jane L. Harless* (argued); *Colonel Richard L. Purdon, Colonel Jeffrey T. Infelise, Captain Jane M.E. Peterson* (on brief).

*Opinion of the Court*

WISS, Judge:

In June 1989, a special court-martial composed of members rejected appellant's not-guilty pleas and convicted him of stealing an oscilloscope, military property of the United States, of a value of approximately $1,999.75. *See* Art. 121, Uniform Code of Military Justice, 10 USC § 921. The members sentenced appellant to a bad-conduct discharge, forfeiture of $466.00 pay per month for 6 months, and reduction to the lowest enlisted grade. The convening authority approved these results. On appeal, however, the Court of Military Review set aside the sentence because of improper argument by trial counsel during those proceedings. 30 MJ 1183 (1990).

At the ensuing sentence rehearing in July 1991, court members sentenced appellant to a bad-conduct discharge and reduction to pay grade E–3. This time on appeal, the Court of Military Review (34 MJ 1123 (1992)) concluded that the military judge had improperly omitted to instruct the members that some term of confinement was a lesser punishment than the punitive discharge. Both parties agreed, though, that a second rehearing was not necessary, so the court reassessed the sentence in light of this error and approved a sentence to 6 months' confinement and reduction to pay grade E–4. *Id.* at 1126–27. *See generally United States v. Sales,* 22 MJ 305 (CMA 1986) (discussing when Court of Military Review may reassess a sentence to cure error and when it must order a rehearing).

On appellant's timely appeal from this second decision below, this Court granted review of the following issue:

WHETHER THE UNITED STATES AIR FORCE COURT OF MILITARY REVIEW ERRED WHEN IT RULED [DURING ITS FIRST REVIEW OF THIS CASE] A REMARK DURING OPENING STATEMENT THAT APPELLANT HAD VOLUNTARILY TURNED IN EVIDENCE OPENED THE DOOR TO TESTIMONY THAT APPELLANT, AT THE SAME TIME, EXERCISED HIS RIGHT TO NOT CONSENT TO A SEARCH OF HIS HOME.

We hold that any evidentiary error during the original court-martial proceeding was not prejudicial as to findings and was mooted as to sentence by the Court of Military Review's order of a rehearing on sentence; that defense counsel's failure to object at the rehearing to introduction of this same evidence from the first proceeding waived any appellate complaint to that evidence; and that, in the circumstances of this case, admission of the evidence at the rehearing was not plain error so as to overcome defense counsel's waiver.

I

During his opening statement prior to trial on the merits, defense counsel explained the defense theory that he anticipated would be demonstrated by the evidence: Essentially, appellant had mistakenly carried off the oscilloscope in an old briefcase that he had carried to work while at a former duty station; when he later discovered the oscilloscope while unpacking, he telephoned his old workplace; he was told not to send the item back because the Office of Special Investigations (OSI) already was involved and the OSI would contact him about it.

So Sergeant Turner just put the item on a shelf at his home and waited for the OSI to contact him. Although the OSI waited several months to contact Sergeant Turner, *he did, voluntarily, surrender the item and make a written statement to Special Agent Gardner as to what happened;* and you will have his written statement before you as to what happened.

(Emphasis added.)

Trial counsel's first witness was Special Agent Gardner, the OSI agent who ultimately did contact appellant. Gardner testified that, when he questioned appellant about the missing oscilloscope, appellant did not request counsel and made a written statement acknowledging that he had the item. Appellant told Gardner that he had contacted Sergeant Seese at his prior workplace and also had told Sergeant Walt at his new base that he had the oscilloscope in his locker where he then was assigned. Then, trial counsel asked

Gardner about the circumstances under which he had recovered the oscilloscope:

> We went with Sergeant Turner, at his request, to his house. My partner and I waited outside of Sergeant Turner's house and Sergeant Turner brought the oscilloscope out of his house and gave it to us.
> Q. Did you ask for permission to search Sergeant Turner's house?
> A. Yes, we did.
> Q. And did he give that permission?
> A. No, he did not.

At that point, defense counsel objected, asserting lack of "relevance." Trial counsel explained that she was "trying to establish the voluntariness of his [appellant's] turning over the oscilloscope, as the defense counsel said in his opening statement." Likening appellant's Fourth Amendment right to privacy to the Fifth Amendment rights to silence and counsel, *see Miranda v. Arizona,* 384 U.S. 436, 471, 489, 86 S.Ct. 1602, 1626, 1635, 16 L.Ed.2d 694 (1966)—neither of which normally can be the subject of comment against an accused, *see Griffith v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *United States v. Mobley,* 31 MJ 273, 279 (CMA 1990), *cert. denied,* —— U.S. ——, 113 S.Ct. 596, 121 L.Ed.2d 533 (1992)—defense counsel countered that appellant's refusal to consent to a search by Agent Gardner "is not relevant to whether or not he actually stole the oscilloscope."

Trial counsel then changed tack and contended that "defense counsel himself opened the door to that when he commented, during his opening statement, about the accused voluntarily turning over the oscilloscope." Defense counsel answered: "Your honor, we're talking about two different things. Turning over the oscilloscope is one thing, and the other thing is the OSI wanting to search his house. That's what my objection is to."

After some brief additional exchanges, the military judge overruled the objection on the following rationale:

> Now, as far as the refusal to consent to a search, I don't think that is subject to the same constitutional protection that a right to silence or a right to counsel is; and if

there's some relevance to it, I would allow trial counsel to elicit from the witness that he declined to consent to the search, but then they went to the house and he voluntarily produced the oscilloscope. I guess your opening statement did raise the issue about how the oscilloscope was turned over to the Government. . . .

When Gardner's questioning resumed, he offered this testimony:

> TC: Now, during the interview with Tech Sergeant Turner, did you request permission to search his house?
> WIT: Yes, we did.
> Q. And did he give that permission?
> A. No, he did not.
> Q. How then did you recover the oscilloscope?
> A. After we had asked him for permission to search his residence and he said no, he made the comment that if we came out there with him, followed him out to his house, he would turn it over to us.

On its initial review of this case, the Court of Military Review rejected appellant's attack on the military judge's ruling. Instead, the court agreed with the judge's reasoning both as to permissibility of eliciting testimony concerning lack of consent to search and as to defense counsel's having opened the door to this area during his opening statement. 30 MJ at 1184.

The subsequent rehearing on sentence, which the Court of Military Review ordered for an unrelated reason, was "a paper case." It consisted of documents and exhibits from the first trial and a redacted version of the relevant portion of the record of that trial. That portion of the record included Agent Gardner's testimony, part of which has been recounted above, but not defense counsel's comments in his opening argument regarding appellant's voluntarily turning over the oscilloscope to the OSI. Defense counsel at the rehearing—who was individually requested by appellant and who was not the same counsel who had represented him at trial—did not object.

## II

### A

■ "[R]efusal to consent to a warrantless search is privileged conduct which cannot be considered as evidence of criminal wrongdoing." *United States v. Prescott*, 581 F.2d 1343, 1351 (9th Cir.1978). *Accord United States v. Thame*, 846 F.2d 200, 206–07 (3d Cir.), *cert. denied*, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988); *United States v. Taxe*, 540 F.2d 961, 969 (9th Cir.1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977). Contrary to the ruling of the military judge and the holding of the court below, the same reasoning that protects from comment an accused's exercise of a Fifth Amendment privilege applies equally to assertion of the right to privacy under the Fourth Amendment. *United States v. Prescott*, 581 F.2d at 1352. *Cf. United States v. Mobley*, 31 MJ at 279 (involving comment on accused's failure to testify or to produce witnesses in his behalf). When the Court of Military Review submitted that "[t]here is no precedent to indicate that allowing the government to present relevant evidence or comment on an accused's refusal to consent to a search is prejudicial error," 30 MJ at 1184, the court begged the question: In the absence of other factors, evidence or comment on an accused's Fourth or Fifth Amendment rights simply is not relevant. *United States v. Prescott, supra* at 1352.

One exception to this lack of relevance is when the comment is an invited response to matter first raised by the defense. *See United States v. McNatt*, 931 F.2d 251, 256–58 (4th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 879, 116 L.Ed.2d 783 (1992); *cf.*

*United States v. Webb*, 38 MJ 62 (CMA 1993) (trial counsel's comment in closing argument on defense failure to produce alibi witness, as defense had promised to do during its opening statement). Two aspects of the factual situation in this case, however, trouble us in applying this rationale here, as both the military judge and the Court of Military Review did.

First, the prosecution produced *evidence* during its case-in-chief in purported rebuttal of *nothing more than* a single passing comment during defense counsel's *opening statement*. Here, in light of our treatment of this issue in subsection B, we need not resolve whether such passing comment by defense counsel during an opening statement, without more, "opened the door" for the Government to introduce evidence of an accused's invocation of his Fourth or Fifth Amendment protections which otherwise would not be relevant. *Compare United States v. McGuire*, 808 F.2d 694, 696 (8th Cir.1987) (error for "Government to introduce rebuttal evidence" on entrapment in case-in-chief in response to defense counsel's opening argument promising entrapment evidence that never materialized), *with United States v. Goodapple*, 958 F.2d 1402, 1407 (7th Cir.1992) (distinguishing *McGuire*: "When the entrapment defense is clearly raised in the defense's opening statement and the entrapment defense obviously materializes through a defendant's presentation of its own witnesses or through cross-examination of the government's witnesses, it is not error for the government to present evidence of predisposition in its case-in-chief....").[1]

■ We do note, however, that opening statements are not evidence, *United States v.*

---

1. *See generally United States v. Franklin*, 35 MJ 311, 317 (CMA 1992) (evidence of prior similar acts admissible where accused contested element of his state of mind by "open[ing] the door to the issue of innocent intent in his opening statement" and by presenting evidence of innocent intent); *United States v. Kerr*, 981 F.2d 1050, 1052 (9th Cir.1992) (no error admitting evidence of prior similar acts where defense "said during opening statement that Kerr possessed cocaine at the time of arrest"; "[i]f the defendant introduces similar acts evidence first, the Government may step through the 'open door.'"); *United States v. Breitkreutz*, 977 F.2d 214, 220 (6th Cir. 1992) (Defense "'opened the door'" to evidence

of drug ledgers when opening statement claimed that none of the searches had revealed any evidence linking defendant with charged co-conspirators); *United States v. Estabrook*, 774 F.2d 284, 289 (8th Cir.1985) ("[W]here it is made clear at the outset of the trial that the defendant's principal defense is a lack of knowledge or intent, and thus the issue is unarguably in dispute, the Government may take the defendant at his word and introduce the evidence in its case-in-chief."); *United States v. Lewis*, 759 F.2d 1316, 1349 and n. 14 (8th Cir.) (Government need not await accused's "denial of intent or knowledge" but "may anticipate" that defense and introduce

*Clifton,* 15 MJ 26, 29 (CMA 1983), and military judges typically instruct members to that effect. In any event, if a defense counsel contends in an opening statement that the evidence will show that the accused voluntarily returned the property in question and then the evidence in fact is not forthcoming, that remark is fair game for appropriate comment in the prosecutor's *closing argument. See United States v. Robinson,* 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988); *United States v. Webb, supra.*[2] Yellow flags (if not red flags) should be apparent when, in response to a mere assertion by counsel during argument, the prosecution seeks to introduce evidence, especially when that evidence otherwise not only is not relevant but also is so subject to ready misinterpretation by a jury that it tends to improperly burden the accused's exercise of a Fourth or Fifth Amendment right. *See United States v. Prescott,* 581 F.2d at 1352.

Second, it would seem that defense counsel was right on target when he argued to the military judge that appellant's refusal to consent to a search of his house was not relevant, under the facts of this case, to whether appellant returned the oscilloscope voluntarily. The testimony of Agent Gardner himself regarding appellant's full cooperation in their investigation was unambiguous: When called in for questioning, appellant waived counsel; candidly admitted having the missing oscilloscope; and, in response to the agents' request to search his house, himself initiated an offer instead to take the agents to his house where he gave them the property. The fact that appellant refused to consent to police officers' tramping through the privacy of his house, in this context, has no arguable relevance at all to whether his return of the property was voluntary. *See United States v. Thame,* 846 F.2d at 206–07 n. 2.

The separate opinion by Judge Crawford would find relevance of this evidence as it

evidence of related crimes that is "'generally admissible'" to establish that intent; in fact, defense did subsequently present the anticipated evidence), *cert. denied,* 474 U.S. 994, 106 S.Ct. 406, 407, 88 L.Ed.2d 357 (1985).

**2.** Judge Crawford·takes exception to "[t]he implication" from this statement "that the prosecution could not introduce evidence to prove the property was not voluntarily returned." Instead, she submits, "The majority rule in the federal circuits is to the contrary." 39 MJ at 266. We do not read the cases upon which Judge Crawford relies as support for her position. Overwhelmingly, they reflect the view that, in those cases, the defense's opening statement was simply a signal of what the defense evidence was going to be, *not* that the opening statement *itself* was an adequate trigger for so-called "rebuttal" evidence by the prosecution.

For instance, in some cases, mention of the opening statement was only in passing and, rather, focused principally on the fact that defense *evidence* was consistent with the remark in the statement. *E.g., United States v. Breitkreutz,* 977 F.2d at 220 (drug ledger was evidence that jury could view as rebutting defense evidence that, while defendant was in a drug conspiracy, he was not in conspiracy charged, and that defense counsel's opening statement inviting the Government to prove to the contrary "lends additional support" to admission); *United States v. McAnderson,* 914 F.2d 934, 946 (7th Cir.1990) (evidence under Fed.R.Evid. 404(b) rebutted remarks in opening statement "and pursued

throughout trial" so that the "line of defense was established"); *United States v. Segal,* 852 F.2d 1152, 1155 (9th Cir.1988) ("From defendant's opening statement, the Government could reasonably have anticipated further evidence of appellant's involvement with cocaine."). The disagreement with Judge Crawford's reading of the cases in this area extends, as well, to her citation to *United States v. Franklin,* 35 MJ 311, 317 (CMA 1992), as an instance in which this Court has "followed the lead of the federal circuits" in finding counsel's opening statement sufficient to open the door. 39 MJ at 266. That case, however, like the ones just discussed, was *not* one in which the opening statement *alone* served to permit admission of the challenged evidence; rather, the defense there had submitted *evidence* of innocent intent which the challenged evidence tended to rebut.

Perhaps the point is most lucidly and cogently made in another of the cases cited by Judge Crawford, *United States v. Hadaway,* 681 F.2d 214, 218–19 (4th Cir.1982), where it was stated:

We do not intend to be understood as suggesting that opening argument by defense counsel, on its own, necessarily affords a basis for invoking Fed.R.Evid. 404(b). That is not the present case. The evidence presented to the jury was what generated uncertainty about knowledge and intent, making resort to the other crimes evidence appropriate. The opening statement by defense counsel is referred to only to provide reinforcement for the conclusion that the evidence not only would, but, in fact, did, generate uncertainty, making necessary the evidence of other crimes.

bears on the dispute that subsequently developed at trial over whether appellant did or did not have a second, privately owned oscilloscope. In the context in which this evidence was elicited, however, it is clear that this argument is make-weight. Defense counsel's pretrial statement was that his client had voluntarily surrendered the *missing* oscilloscope—a statement which neither expressly nor implicitly says anything at all about his client's level of cooperation in producing an alleged *second* oscilloscope. Further, it is abundantly clear that trial counsel himself asserted relevance only regarding appellant's cooperation in turning over the *missing* oscilloscope. Finally, nothing at all in Agent Gardner's testimony even hints at the fact that they had asked appellant's permission to search for a *second* oscilloscope.

In other words, Judge Crawford seizes upon a single passing remark in the defense's opening statement addressing appellant's cooperation in locating the *missing* oscilloscope; infers that evidence of his refusal to consent to a search of his premises to find that *missing* oscilloscope somehow was relevant to a later dispute at trial as to whether appellant had a *second* oscilloscope; and reasons that the comment on appellant's reliance on his Fourth Amendment protection was in response to his own counsel's having opened the door. We find nothing at all in the brief remark in defense counsel's opening statement that expresses or fairly implies anything at all about a second oscilloscope.

### B

■ Nonetheless, we are satisfied that appellant suffered no prejudice from any error just discussed. *See generally id.* On the merits, the only issue in contest was appellant's *mens rea.* While defense counsel sought to persuade the members that appellant's possession of the oscilloscope had been inadvertent and that appellant had taken steps to return it as soon as he had discovered it, the prosecution's evidence was that no one had received any such telephone call from appellant at his old workplace. Other prosecution evidence, as well, tended to support the criminal intent necessary to prove appellant guilty of larceny. Moreover, as discussed earlier, appellant's refusal of consent to search his house, in the context in which Agent Gardner explained it, was so wholly irrelevant to the question of appellant's voluntary relinquishment of the oscilloscope that it could not reasonably be seen to have undermined appellant's position at all on that point.

As to whether it might have tended to brand him generally as someone with something to hide, we are fully confident that, in the circumstances of this case, that did not occur. *See id.* In this connection, we point out that the only time the matter of appellant's refusal of consent came out at all was in the context quoted earlier; it never arose subsequently in the evidence, and trial counsel never mentioned it during her closing argument. Accordingly, our examination of the record as a whole convinces us beyond a reasonable doubt that any error did not contribute to the members' finding on this issue adverse to appellant. *See United States v. McNatt, United States v. Thame,* and *United States v. Taxe,* all *supra* at 262.

As stated earlier, the Court of Military Review set aside the original sentence for an unrelated reason and ordered a rehearing. Without question, that action rendered moot the impact of any error in this regard as to the original sentence. The same error, of course, occurred at the sentence rehearing (and this time without any possible argument that it was in response to defense counsel's opening statement, since that portion of the record was not introduced at the rehearing). Defense counsel's failure to object, however, waived any appellate complaint, *see* Mil. R.Evid. 103(a)(1), Manual for Courts-Martial, United States, 1984; and we are confident that it was not plain error so as to overcome the failure to object, *see United States v. Fisher,* 21 MJ 327, 328 (CMA 1986). *See generally United States v. Thame,* 846 F.2d at 206–07.

### III

The decisions of the United States Air Force Court of Military Review dated June 7, 1990, and May 22, 1992, are affirmed.

Chief Judge SULLIVAN and Judges COX and GIERKE concur.

CRAWFORD, Judge (concurring in the result):

The majority applies the *harmless error* test for "any error" that may have occurred and instructs that "the prosecution [erroneously] produced *evidence* during its case-in-chief in purported rebuttal of *nothing more than* a single passing comment during defense counsel's *opening statement*." 39 MJ at 262, 264. This application of the law overlooks (A) the facts; (B) the planning and tactical decisions that go into an opening statement; and (C) the majority federal rule as well as prior cases of this Court. In my opinion the judge did not abuse his discretion. *See United States v. Segal,* 852 F.2d 1152, 1155–56 (9th Cir.1988); *United States v. Acosta,* 763 F.2d 671, 694–96 (5th Cir.), *cert. denied,* 474 U.S. 863, 106 S.Ct. 179, 88 L.Ed.2d 148 (1985).

### A. *The Facts*

According to the defense theory of the case, appellant was merely a cooperative sergeant who, on a wintery day in January 1989, finally went through his household goods shipped from Japan to North Dakota, discovered therein (to his surprise) government property (an oscilloscope from Japan), and voluntarily turned it over to agents of the Office of Special Investigations (OSI). Thus, there was no criminal intent and no crime.

Unfortunately for appellant, the evidence refuted this simple scenario. Before appellant even "discovered" that he had the oscilloscope in January 1989, he was involved in the following mysterious occurrences. According to OSI Special Agent Gardner, appellant told him that he called Japan in November or December 1988 and spoke with Sergeant Seese. He allegedly told Sergeant Seese that he found an oscilloscope and asked if it should be mailed back to Japan. Sergeant Seese, according to appellant, advised him not to do anything with the oscilloscope until he was approached by the OSI. Sergeant Seese, however, denied that he had ever received any call from appellant "regarding the oscilloscope." Further, several witnesses testified that during November and December 1988, appellant brought an oscilloscope to work.

When asked about the oscilloscope he brought to work, appellant claimed, in his oral statement to OSI, that it was his own personal oscilloscope which he had bought on the open market in Japan. Upon being finally asked by the OSI to produce an oscilloscope, appellant refused to consent to a search of his quarters. He agreed instead to turn over an oscilloscope to the OSI agents if they came to his house and waited outside. The serial number of the oscilloscope he turned over to the OSI agents was the same as that of the oscilloscope that was missing from Japan.

### B. *The Planning and Tactical Decisions That Go Into an Opening Statement*

After the voir dire is conducted by the military judge, the opening statement becomes a critical part of the trial. Studies have shown that "80% of jurors make up their minds during opening and never change their opinions." Jossen, *Opening Statements: Win it in the Opening,* 10 The Docket (The Newsletter of the National Institute for Trial Advocacy) 1, 6 (Spring 1986). Even if that figure is overstated, it does emphasize the importance of the opening statement. It is during the opening statement that the parties set forth their theory and theme of the case.

Here, defense counsel in his opening statement set forth the defense theory of the case, *i.e.,* that appellant had committed an honest mistake as evidenced by his cooperation with the OSI. I respectfully must disagree with my colleagues in the majority who would characterize defense counsel's comments about appellant's voluntariness as *"nothing more than* a single passing comment during ... [the] opening statement." Appellant's so-called cooperation in the search was strategically used by the defense to infer that appellant was unconcerned in surrendering the oscilloscope and thereby demonstrated that he did not steal it.

The first few questions of the court members reveal that they immediately zeroed in on whether appellant had two oscilloscopes in his possession and whether there was an inconsistency in the dates of the discovery of the Government's missing oscilloscope:

Did anyone ever positively identify SGT Turner's oscilloscope as being precisely the same type as the PMEL version?

\* \* \*

SGT Turner said he fixed other peoples' electronic equipment. What oscilloscope did he use if his personal OSC was in SD until Apr?

\* \* \*

Has anyone ever verified that SGT Turner in fact had two oscilloscopes in his possession?

App. Ex. II

If Turner's oscilloscope was left in SD (Scotland), was he able to produce it?

Where's the oscilloscope he claimed he bought it [sic] in Tokyo?

App. Ex. III

TSGT Turner said he found the gov scope while unpacking his new computer. Did he say when this was, November or January?

App. Ex. IV

Other than the comment by TSgt Turner, has the oscilloscope been positively identified as belonging to Misawa, *i.e.,* by serial number?

App. Ex. V

When did SGT Turner bring the oscilloscope into his work area? Did he claim at *that* time it was his personal oscilloscope?

App. Ex. VI

Did you personally inspect to find the scope missing the first time it was reported missing?

App. Ex. VII

In order to rebut the inference of voluntary cooperation the Government legitimately countered with relevant evidence demonstrating that appellant's apparent cooperation only extended to his front door. The counter inference is that appellant had something to hide, namely, that he possessed no second oscilloscope and that the oscilloscope he brought to work in November or December 1988 was the same one he claimed to have only discovered in his household goods in January of 1989. This evidence is proof that, appellant's assertions to the contrary,

he had the criminal intent to steal and indeed stole the oscilloscope from the air base in Japan.

If defense counsel truly believed his opening statement's reference to appellant's cooperation was a mere passing comment unfairly used by the prosecution to its advantage, defense counsel could have asked the military judge for permission to qualify his opening statement or to have that portion stricken as an inadvertent misstatement. Instead defense counsel strategically used the reasonable inference of innocence flowing from full cooperation. *Cf. United States v. Kindler,* 14 USCMA 394, 399, 34 CMR 174, 179, 1964 WL 4992 (1964).

#### C. *The Majority Federal Rule and the Prior Cases of This Court*

The majority opinion states, "In any event, if a defense counsel contends in an opening statement that the evidence will show that the accused voluntarily returned the property in question and then the evidence in fact is not forthcoming, that remark is fair game for appropriate comment in the prosecutor's *closing argument."* 39 MJ at 263. The implication is that the prosecution could not introduce evidence to prove that the property was not voluntarily returned.

The majority rule in the federal circuits is to the contrary. This does not mean that the military judge may not exercise discretion and exclude unfairly prejudicial evidence under Mil.R.Evid. 403, Manual for Courts–Martial, United States, 1984. All the circuits agree that the opening statement opens the door. *United States v. Kerr,* 981 F.2d 1050, 1052 (9th Cir.1992); *United States v. Breitkreutz,* 977 F.2d 214, 220 (6th Cir.1992); *United States v. McAnderson,* 914 F.2d 934, 948 (7th Cir.1990); *United States v. Colon,* 880 F.2d 650, 660 (2d Cir.1989); *United States v. Segal,* 852 F.2d 1152, 1155–56 (9th Cir.1988); *United States v. Bari,* 750 F.2d 1169, 1182 (2d Cir.1984), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); *United States v. D'Alora,* 585 F.2d 16 (1st Cir.1978). *Cf. United States v. Acosta,* 763 F.2d at 694–96; *United States v. Hadaway,* 681 F.2d 214, 218–19 (4th Cir.1982).

We followed the lead of the federal circuits in *United States v. Franklin,* 35 MJ 311, 317 (CMA 1992), holding that "trial defense counsel opened the door to the issue of innocent intent in his opening statement by arguing that the Government would not be able to prove premeditation and attempted rape." *See also United States v. Houser,* 36 MJ 392(CMA), *cert. denied,* — U.S. ——, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993).

A paraphrasing in the language in *United States v. Havens,* 446 U.S. 620, 626–27, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980), might be applicable in this case. "It is essential, therefore, to the proper functioning of the adversary system that when ... [the defendant's counsel makes a misleading statement], the government be permitted ... to elicit the truth." In *Havens,* the Court held that illegally seized evidence might "be used to impeach" defendant's trial testimony, even though it did "not squarely contradict the defendant's testimony on direct examination." *Id.* at 621, 100 S.Ct. at 1913.

Additionally the Court recognized in *Nix v. Whiteside,* 475 U.S. 157, 174, 106 S.Ct. 988, 998, 89 L.Ed.2d 123 (1986), "a key component of a system of justice, dedicated to a search for truth" is the obligation for an individual to testify truthfully. The Court held a counsel's disclosure to the judge of the intent of his client to testify untruthfully does not violate the defendant's right to counsel.

In *Jenkins v. Anderson,* 447 U.S. 231, 240, 100 S.Ct. 2124, 2130, 65 L.Ed.2d 86 (1980), the Court held that the pre-arrest silence by the defendant may be used to impeach him, assuming no prior warning of the right to remain silent.

Also in *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Court held that a statement taken in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), may be used to impeach the defendant's credibility. The emphasis was that the "prosecution ... did no more than utilize the traditional truth-testing devices of the adversary process." *Id.* at 225, 91 S.Ct. at 645.

Based on the majority's view of this case, when the defense makes a misleading statement in its opening statement, the prosecution may merely comment in its closing argument that there has been no evidence that the accused voluntarily cooperated in turning over the device. In the interests of truth-finding in an adversarial process I believe there are other alternatives. As here, the military judge should exercise discretion in determining whether and at what stage of the trial to admit or exclude government evidence to rebut the defense inference of voluntary cooperation by the accused. Appellate courts may then review the judge's ruling for an abuse of discretion. S. Childress and M. Davis, *Federal Standards of Review* § 11.02 at 11–5 (2d ed.1992). As an alternative, the prosecution or the defense could request that the defense assertion of voluntary cooperation by the accused be stricken from the record and that the members be instructed to disregard the statement. A *per se* rule of inadmissibility of government evidence to rebut an opening statement by the accused's counsel setting forth the defense theory of the case does not, in my view, advance the interests of truth-finding which should be at the very heart of the trial.

### Conclusion

There is no question that the prosecution may not in the first instance introduce evidence that a criminal defendant invoked his or her Fourth Amendment right to privacy. However, the defense may not use the Fourth Amendment as a shield against legitimate contradiction of his inference that he cooperated and is therefore innocent. Thus, the theory for admissibility of the evidence is not Mil.R.Evid. 404(b) but rather the common law rule of contradiction. *United States v. Toro,* 37 MJ 313, 315 (CMA 1993).

Opening of the door during an opening statement does not mean that the judge may not exercise discretion and exclude admissible and relevant evidence. The judge may exclude such evidence when the defense requests an inadvertent statement to be stricken or when the judge finds the evidence to be unduly prejudicial or applies other factors set forth in Mil.R.Evid. 403.

This case involves the proper functioning of the adversarial system. To forbid introduction of rebuttal evidence under the circumstances of this case would undermine the truth-finding function of our system of justice. Thus, I would conclude that there was no error here and affirm on that basis alone.